UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Troy Greene,<br><br>    Plaintiff,<br><br>    — against —<br><br>Rochdale Village Special Patrolman Kendall Bryan,<br><br>    Defendant. | **15-CV-249 (ARR) (RER)**<br><br>**Not for electronic or print publication**<br><br>**Opinion & Order** |

ROSS, United States District Judge:

   Troy Greene is suing Rochdale Village Special Patrolman Kendall Bryan under 42 U.S.C. § 1983 for false arrest and imprisonment,[1] malicious prosecution, and excessive force. This action stems from the events of December 7, 2013, when Bryan arrested Greene for purportedly trespassing inside Rochdale Village, a private housing complex in Queens. During the course of this incident, Greene either jumped down the stairs while fleeing or was pushed down the stairs by Bryan. The ensuing fall resulted in a fracture of his left leg. Greene is moving for summary judgement on the false arrest and malicious prosecution claims, but not the excessive force claim. Bryan is moving for summary judgment on all claims. Because issues of disputed fact preclude judgment as a matter of law on any claim, both parties' motions are denied.

---

[1] I will "use the terms 'false arrest' and 'false imprisonment' interchangeably" because, "[u]nder New York law, 'the tort of false arrest is synonymous with that of false imprisonment.'" *Liranzo v. United States*, 690 F.3d 78, 91 n.13 (2d Cir. 2012) (quoting *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991)).

# BACKGROUND

## A. Undisputed Facts

Rochdale Village is a private apartment complex located in Jamaica, Queens. Def.'s Local Rule 56. 1 Statement ¶¶ 1–2, ECF No. 59-1 ("Def.'s 56.1 Statement").[2] It contains a number of thirteen-story buildings with six or seven apartments per floor. Def.'s 56.1 Statement ¶ 1. This incident occurred in Building Nine. *Id.* ¶ 2. Rochdale Village maintains a private security force, which includes public safety officers, special patrolmen, and off-duty police officers. Pl.'s Statement of Undisputed Material Facts Pursuant to Rule 56.1 ¶ 2, ECF No. 57-2 ("Pl.'s 56.1 Statement"); Def.'s Am. Resp. to Pl.'s Statement of Undisputed Material Facts Pursuant to Rule 56.1 ¶ 2, ECF No. 64 ("Def.'s 56.1 Resp.").

As of the date of this incident, defendant Kendall Bryan was working as a special patrolman at Rochdale Village (he has since been promoted to sergeant). Pl.'s 56.1 Statement ¶ 4; Def.'s 56.1 Statement ¶ 6. As a Rochdale Village special patrolman, Bryan was deputized as a peace officer under New York City Administrative Code section 14-106(c). Def.'s 56.1 Statement ¶ 6. Sworn peace officers like Bryan have "certain limited arrest power[s]." Pl.'s 56.1 Statement ¶ 5. Specifically, if a peace officer does not have a warrant, he may arrest an individual for a misdemeanor or felony when "he has reasonable cause to believe that such person has committed such crime," but may only arrest an individual for a non-criminal offense "when he has reasonable cause to believe that such person has committed such offense in his presence." N.Y. Crim. Proc. Law § 140.25(1). At all times relevant to this case, Bryan was acting "under color of law" because

---

[2] Unless otherwise noted, all statements of fact that I attribute to a given party's Local Rule 56.1 statement have been admitted—at least in relevant part—by the opposing party in their response.

he was "acting in his capacity as [a] [p]eace [o]fficer empowered to make warrantless arrest[s] under the laws of New York State." Pl.'s 56.1 Statement ¶ 70.

On December 7, 2013, plaintiff met with his friends Jonathan Skinner and Edward Horry in Queens. *Id.* ¶¶ 12–14. After spending some time together, they decided to go to a party in an apartment in Rochdale Village Building Nine. *Id.* ¶¶ 15–16.[3] Both Skinner and Horry lived in Rochdale Village, although neither man lived in Building Nine. Pl.'s 56.1 Statement ¶ 18; Def.'s 56.1 Resp. ¶ 18. Jonathan Skinner drove the three men to Building Nine. Pl.'s 56.1 Statement ¶ 19. They then got out of the car, entered Building Nine through the front door, and walked through the lobby to the rear elevators. *Id.* ¶¶ 20–21. Although the party was on the sixth floor, the elevator that went to odd floors arrived before the elevator that goes to even floors, so the three men took the elevator to the fifth floor with the intent of walking to the sixth floor.[4] *Id.* ¶¶ 22–23. When they got out of the elevator on the fifth floor, there were several young men standing in the hallway that separates the elevator from the stairwell. *Id.* ¶ 24. Greene testified that he did not know any of the men, but Horry and Skinner knew some of them from the neighborhood. *Id.* ¶ 25. Horry and Skinner greeted the men. *Id.* ¶ 26. Other than Horry, Skinner, Greene, and these young men, no one else was in the vicinity. *Id.* ¶ 27.

Meanwhile, Bryan was patrolling the Rochdale Village grounds. *Id.* ¶ 28. At about 10:41 p.m., he received a call from the dispatcher relaying that there were individuals loitering and gambling on the fifth floor of Building Nine. *Id.* ¶¶ 28–29. Bryan and a number of other members

---

[3] Although defendant points out that Skinner, Horry, and Greene testified inconsistently as to whom the party was for, Def.'s Am. Resp. to Pl.'s Statement of Undisputed Material Facts Pursuant to Rule 56.1 ¶¶ 15–16, ECF No. 64 ("Def.'s 56.1 Resp."), all three men testified that they were going to a party in an apartment in Building Nine—and the defendant does not dispute this fact. *See id.*
[4] Horry and Skinner testified that the party was on the fourth floor and they took the elevator to the fifth floor with the intent of walking down a flight of stairs instead. But this difference is immaterial.

of the Rochdale Village security force responded to Building Nine. *Id.* ¶ 30. Bryan and two other public safety officers then took the elevator to the fifth floor. *Id.* ¶ 31. When the elevator doors opened, Bryan saw several individuals standing in a circle. *Id.* ¶ 32.

What happened next is in dispute. But the parties agree that several individuals, including Edward Horry, fled from Rochdale Village security. *Id.* ¶ 35. It is also undisputed that two officers grabbed Skinner on the fourth floor and placed him in handcuffs, although he was ultimately not prosecuted for trespassing. *Id.* ¶¶ 36–37. Moreover, even though "the facts surrounding [Greene's] seizure remain in dispute"—as I will detail below—it is undisputed that, as a result of this incident, Greene came to be lying on the floor of Building Nine's stairwell, "screaming in pain." *Id.* ¶ 38.

Bryan called emergency medical services (EMS) for Greene, who placed Greene on a stretcher and took him to Jamaica Hospital. *Id.* ¶¶ 39–40. Before EMS put Greene into the ambulance, Bryan handcuffed Greene to the stretcher and placed him under arrest for trespassing. *Id.* ¶ 41. Bryan rode with Greene in the ambulance to Jamaica Hospital. *Id.* ¶ 46. He did not remove Greene's handcuffs upon arrival at the hospital, or during the triage examination. *Id.* ¶ 47. In fact, although he was unable to walk, Greene was handcuffed to his hospital bed for the next five days, while he underwent two surgeries to treat a tibial plateau fracture of his left leg. *Id.* ¶¶ 54–55. During those five days, Rochdale Village officers watched over Greene twenty-four hours a day. *Id.* ¶ 55. Other than one call to his parents, these officers did not permit Greene to use the phone. *Id.* ¶¶ 56–57. They also did not permit Greene's parents to visit him at the hospital. *Id.* ¶ 58.

On December 13, 2013, Bryan unhandcuffed Greene and issued him a desk appearance ticket, charging him with trespass. *Id.* ¶¶ 51, 59; Decl. of Richard J. Washington in Supp. of Pl.'s Mot. for Summ. J. ("Washington Decl."), Ex. 6, at 164–65, ECF No. 58-3 ("Bryan Dep."). Greene

was discharged from Jamaica Hospital. Pl.'s 56.1 Statement ¶ 59. He then spent the next three months recuperating from his leg fracture at an in-patient rehabilitation facility. *Id.* ¶ 60.

## B. Disputed Facts

### 1. Bryan's Account

Bryan testified at his deposition that when the elevator doors opened on the fifth floor of Building Nine, he saw five or six individuals standing in a circle one or two feet in front of the elevator. Bryan Dep. 64. Greene was part of this circle, as was everyone Bryan could see in the hallway. *Id.* at 66, 73. One of the individuals in this circle was shaking his hand as if to throw dice, and other individuals had money in their hands. *Id.* at 65. But Bryan did not see money or dice on the floor, nor did he see Greene or Skinner holding any dice. *Id.* at 65, 75–76. As far as he knows, no officer recovered any dice or money as a result of Greene or Skinner's arrests. *Id.* at 78.

After the elevator doors opened, all of the individuals standing in the hallway ran down the stairs. *Id.* at 65–66. Bryan and his fellow officers followed them. *Id.* at 68. Bryan helped two other officers apprehend and handcuff Skinner on the fourth floor. *Id.* He then continued downstairs. *Id.* at 68–69. When he got to the top of the first floor landing, he saw Greene lying on the ground between the first floor and the ground floor. *Id.* at 69. Greene had been running down the stairs in front of him, skipping steps. *Id.* at 72. He had lost sight of Greene at around the third floor. *Id.* at 75. He did not see or hear Greene fall down the stairs. *Id.* at 112.

Greene was screaming, saying that his knee was hurt. *Id.* at 77. Bryan called for EMS. *Id.* Bryan then waited in the hallway outside the staircase for the ambulance to arrive. *Id.* at 113. Other officers were also present. *Id.* at 114. While they were waiting, Greene was screaming that his knee was broken. *Id.* Bryan did not speak to Greene while waiting for EMS. *Id.* at 114–15. First, Bryan testified that "[n]o one" spoke to Greene while they were waiting for the ambulance; then, he said

he was "not sure" if anyone said anything to Greene during this time. *Id.* at 115. He later clarified

that, at the point that he handcuffed Greene to the stretcher, "no one had spoken to Mr. Greene,"

as far as he was aware. *Id.* at 116. No one knew if Greene was a visitor or a resident. *Id.*

Bryan went with Greene when EMS put him in the ambulance and transported to the

hospital. *Id.* at 121–22. Greene did not say anything to Bryan from the time Bryan discovered him

lying on the ground until the time that EMS brought Greene to the ambulance. *Id.* at 121. Greene

"was saying things, but not directed to [Bryan]." *Id.* To the best of his knowledge, Bryan had not

said anything to Greene either at this point. *Id.* Eventually, however, Bryan spoke to Greene at

the hospital; he was trying to calm Greene down because Greene was screaming. *Id.* at 125–26.

Greene told Bryan at some point in the hospital that he had jumped down the steps "from the

fifth floor to the fourth floor, fourth to the third, and then started rolling down because he was

in so much pain." *Id.* at 153. Greene also told Bryan in the hospital, "I can't believe I busted my

knee for a violation," and that "he's from the projects, and when you see the police, everybody

runs." *Id.* at 150–51. Bryan relayed these statements to the District Attorney's Office. *Id.*

Greene and Skinner were the only two individuals arrested during this incident. *Id.* at 118.

Bryan knew from prior arrests made by his sergeant that Skinner lived in Rochdale Village, but

did not live in Building Nine. *Id.* at 89–90. He thought Skinner was trespassing because he lived

in a different building, although Bryan was not sure if Skinner was visiting anyone in Building

Nine. *Id.* at 99–100. Bryan had asked Skinner if he was visiting anyone in that building, *id.* at 100,

104, but Skinner would not say, *id.* at 100–01. In Bryan's experience, individuals do not want to

give the names of the people they are visiting to Rochdale security because security may issue that

resident an "in-house violation." *Id.* at 105.

### 2. Greene's Account

Greene testified that he and his friends were buzzed into Building Nine after Skinner spoke to someone over the intercom. Washington Decl., Ex. 4, at 120–22, ECF No. 58-1 ("April 25, 2017 Greene Dep."). When they got out of the elevator on the fifth floor, Skinner and Horry saw three men that they knew. *Id.* at 129–30. Greene, Skinner and Horry walked into the stairwell and talked with these men for five to seven minutes. *Id.* at 140. No one was doing drugs or gambling; no one took out any dice. *Id.* at 145–46. Then, after five to seven minutes of conversation, the elevator doors opened and Rochdale security "rushed" them. *Id.* at 147.

Everyone in the stairwell other than Greene and Skinner ran. *Id.* at 158. Greene remained standing there, and put his hands up. *Id.* at 159. He was standing on the fifth-floor landing, at the top of the staircase, facing down. *Id.* at 159–60, 164. While he was standing there, Bryan pushed him by his back without saying a word. *Id.* at 161, 164. Skinner was also still standing on the fifth floor landing, by the door to the hallway, and saw Bryan push Greene. *Id.* at 160, 163.

Greene fell down the stairs when Bryan pushed him. *Id.* at 166–67. As he fell, he tried to grab onto the railing, which caused him to break a finger on his left hand. *Id.* at 169. He landed on the fourth floor landing and then "went down another flight." *Id.* at 170. He came to a stop at the third-floor landing, but continued going down the stairs under his own power despite the pain to his leg because he was scared of Bryan. *Id.* at 181–82. He was sliding headfirst down the stairs on his back. *Id.* at 183. As he was going down the stairs, he was screaming out in pain, "my leg." *Id.* at 195. Eventually, he came to a rest between the second floor and first floor landing. *Id.* at 191. Bryan then radioed for an ambulance because Greene's leg was broken. *Id.* at 193. Greene told him, "of course it's broke, you ain't have to push me." *Id.*

While they were waiting for EMS, there were a lot of officers standing around, saying that he should not have run; Greene was screaming that Bryan had pushed him. *Id.* at 198–205. Bryan denied doing so. *Id.* at 205. Later, in the ambulance, Bryan asked what Greene had been doing in the hallway, but Greene did not respond. Washington Decl., Ex. 5, at 38, ECF No. 58-2 ("July 6, 2017 Greene Dep."). Bryan denied pushing him again; Greene reiterated that Bryan had pushed him. *Id.* Those were the only words exchanged between the two men in the ambulance. *Id.*

### C. Criminal Case

Early the next morning, Bryan went to the 113th Precinct to fill out Greene's arrest paperwork. Pl.'s 56.1 Statement ¶ 50. Bryan filled out an arrest report charging Greene with criminal trespass in the third degree—a "B" misdemeanor—and disorderly conduct under New York Penal Law Section 240.20(5) for obstructing vehicular or pedestrian traffic—a violation. Washington Decl., Ex.16, ECF No. 60–2 ("Arrest Report"). The arrest report listed a home address for Greene that was not Rochdale Village. *Id.*[5] Bryan also swore to a criminal complaint, under penalty of perjury, charging Greene with criminal trespass in the third degree under New York Penal Law Section 140.10(e). Pl.'s 56.1 Statement ¶¶ 51–52. The criminal complaint alleged that Greene was unlawfully present in a New York City Housing Authority building. *Id.*[6] Greene was never prosecuted for disorderly conduct. Pl.'s 56.1 Statement ¶ 53. The Queens County

---

[5] It is not clear from the record how Bryan obtained this information but, presumably, he either asked Greene for his address or retrieved some form of identification from him, as the address on the arrest report matches an address where Greene testified he had lived prior to this incident. *Compare id.*, *with* April 25, 2017 Greene Dep. 22–23.

[6] Bryan admitted in his deposition that this complaint gave the wrong time—10:18 p.m. instead of 10:41 p.m.—and incorrectly stated that Rochdale Village was part of the New York City Housing Authority. Bryan Dep. 149. He stated that the complaint was drafted by an assistant district attorney, although he reviewed it before signing it, *id.* at 145, and that he overlooked these errors, *id.* at 150. The latter error, but not the former, was corrected in the superseding complaint Bryan later signed.

District Attorney's Office later served Greene with a superseding complaint, charging him with criminal trespass in the second degree—New York Penal Law Section 140.15—instead of criminal trespass in the third degree. *Id.* ¶ 64. At this time, the district attorney's office also served Greene with a notice of a statement he had purportedly previously made, that "he jumped down the stairs when he broke his leg." *Id.* ¶ 65.

In connection with this prosecution, a suppression hearing was held in Queens County Criminal Court on February 23, 2015. Decl. of Allyson Lubell in Opp. to Pl.'s Mot. for Summ. J., Ex. A, ECF No. 63-1 ("Suppression Hr'g Tr."). Bryan was the sole witness to testify at this hearing. His hearing testimony differed in two relevant respects from his deposition testimony. First, Bryan testified that before he placed Greene in handcuffs, Greene said he did not live in Rochdale Village. *Id.* at 19–20. And, second, Bryan testified that while he was at Jamaica Hospital, he asked Greene whether Greene knew anyone at Rochdale and Greene responded that "he did, but he didn't want to give us nobody's name." *Id.* at 14. At the conclusion of the hearing, the court denied the suppression motion, finding that there was probable cause to arrest Greene. The hearing court found that "[a]lthough defendant was not holding any money or throwing dice, there were other individuals that were doing that and [he] was part of the circle." *Id.* at 28. On this basis, the court concluded, "once the officer responded to the fifth floor at [Building Nine], clearly, there was some illegal activities involved, and the defendant was part of that illegal activity, and there was probable cause to arrest him." *Id.* at 29.

Ultimately, the criminal court dismissed the case against Greene on speedy trial grounds on November 17, 2015, because the prosecution was not ready for trial within the "90-day statutory time frame." Pl.'s 56.1 Statement ¶ 66; *see also* N.Y. Crim. Proc. Law § 30.30(1)(b).

# DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact" and that she "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). A genuine dispute is one that can "reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In performing this analysis, I must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). "If, in this generous light, a material issue is found to exist, summary judgment is improper, and the case must proceed to trial." *Nationwide Life Ins. Co v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999) (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985)).

The moving party may show that there is no genuine dispute "by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223–24 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the moving party meets this burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998). The non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' . . . and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)). If "no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted." *Id.* (quoting *Great Am. Ins. Co.*, 607 F.3d at 292).

Here, however, neither party is entitled to summary judgment on any of the claims.

# I. Taking the facts in the light most favorable to the plaintiff, the defendant's use of force was objectively unreasonable under the Fourth Amendment.

Excessive force claims brought under 42 U.S.C. § 1983 are analyzed under the Fourth Amendment's reasonableness standard if they arise "in the context of an arrest or investigatory stop of a free citizen." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. This inquiry is "an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. A court must consider the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. In determining whether the use of force is objectively reasonable, courts in this district have looked to "the need for the use of force, the relationship between the need for force and the amount of force used, [and] the extent of any injury." *Turner v. White*, 443 F. Supp. 2d 288, 293 (E.D.N.Y. 2005) (alteration in original) (quoting *Banks v. Person*, 49 F. Supp. 2d 119, 125 (E.D.N.Y. 1999)).

The defendant's argument that his use of force was reasonable as a matter of law largely relies on *Graham*'s dictum that "not every push or shove, even if it may later seem unnecessary in the piece [sic] of a judge's chambers[,] violates [the] Fourth Amendment." Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 24, ECF No. 59-30 ("Def.'s Mem. of Law") (quoting *Graham*, 490 U.S. at 396). But it does not follow from Greene's testimony that the defendant pushed him and *Graham*'s statement that not every push or shove is unreasonable that the purported push here was reasonable. Pushing someone who is standing at the top of a flight of stairs poses a significant

risk of serious injury—like the injury plaintiff in fact suffered—and thus requires greater justification than the average shove.

Construing the evidence in the light most favorable to the plaintiff—as I must do on a summary judgment motion—he was standing at the top of the stairs, with his hands raised in the air, when Bryan pushed him from behind. April 25, 2017 Greene Dep. 159–61, 164. This push caused Greene to fall down the stairs, fracturing his left leg. *Id.* at 166; Pl.'s 56.1 Statement ¶ 54.

If the plaintiff's account is credited, pushing him down the stairs was an unnecessary and disproportionate use of force, which resulted in serious injury. Greene was suspected of a minor, non-violent offense: either trespassing, disorderly conduct, or loitering for the purpose of gambling. He was not fleeing or attempting to evade arrest. And he did not pose a danger to anyone. A jury could easily find that the purported push was objectively unreasonable, even when viewed from the perspective of a reasonable officer on the scene. *See Adedeji v. Hoder*, 935 F. Supp. 2d 557, 565–69 (E.D.N.Y. 2013) (holding that a reasonable jury could find that "nudging" forward a handcuffed arrestee who was refusing to move while standing at the top of a slippery set of stairs was objectively unreasonable force because, although the use of force was "slight," it "carried with it a substantial risk that [the plaintiff] would slip and fall down the stairs").

The sole authority that defendant cites in support of his motion for summary judgment on the excessive force claim—other than *Graham*—does not support his argument. Bryan offers *Koeiman v. City of New York*, 829 N.Y.S.2d 24 (App. Div. 2007), as an example "of the deference given to police officers when effectuating a split-second arrest on a suspect who was actively fleeing." Def.'s Mem. of Law 23. *Koeiman* is a case, however, where the plaintiff assaulted a police officer "without provocation or justification," and then resisted that officer's "efforts to restrain

him." 829 N.Y.S.2d at 26. Again, taking the facts in the light most favorable to the plaintiff, Greene was simply standing at the top of the stairs, with his hands raised. *Koeiman* is thus inapposite.

Further, to the extent that Bryan is arguing that he should be granted summary judgment because Greene's version of events is incredible, this argument fails as well. Much of defendant's discussion of the excessive force issue is devoted to his claim that "there is absolutely no testimony to corroborate plaintiff's self-serving claim that he had been pushed by Bryan on the 5th Floor landing." Def.'s Mem. of Law 24–25. But, as defendant implicitly concedes by stating that he is moving for summary judgment "as a matter of law" on the facts "taken in the light most favorable to the plaintiff and regardless of the testimony deemed most credible," *id.* at 25–26, this is not the rare case where "no reasonable person could believe [the plaintiff's] testimony." *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005). While the deposition testimony of non-party witnesses Edward Horry and Jonathan Skinner was not consistent with Greene's deposition testimony in every detail, drawing all inferences in plaintiff's favor, their testimony tends to corroborate Greene's claim that Bryan pushed him down the stairs.[7] And, unlike *Jeffreys*, this is not a case where the plaintiff's testimony "is contradictory and incomplete." 426 F.3d at 554. Although Bryan testified that Greene told him at the hospital that he had jumped down the stairs, Bryan Dep. 153; *see also* Pl.'s 56.1 Statement ¶ 65, the only evidence that Greene made this contradictory prior

---

[7] Horry testified that, as he ran down the stairs, he looked back and saw Greene falling down the stairs. Washington Decl., Ex. 11, at 49, 52, ECF No. 60 ("Nov. 17, 2017 Horry Dep."). Horry did not see what caused Greene to fall, *id.* at 86, but thought Greene was falling too fast to have simply slipped, *id.* at 89–90. Horry also noted that there was no water on the floor. *Id.* at 90. Skinner testified that, after the other men in the hallway had fled and the security officers ran past them, Skinner and Greene began to walk down the stairs. Washington Decl., Ex. 12, at 94, ECF No. 60-1 ("Skinner Dep."). When they reached the fourth floor landing, two additional security officers came from behind them. *Id.* at 95. One of these officers grabbed Greene by his clothes, pushing him down the steps. *Id.* at 104. Skinner thought Greene was pushed because of the way he fell down the stairs. *Id.* at 106.

statement is Bryan's own self-interested testimony, which a reasonable jury could disbelieve. In short, plaintiff's deposition testimony was not "'so replete with inconsistencies and improbabilities' that no reasonable juror would . . . credit [his] allegations." *Jeffreys*, 426 F.3d at 555.

I therefore deny defendant's motion for summary judgment on the excessive force claim.[8]

## II. Issues of disputed fact preclude summary judgment for either party on false arrest.

Both parties move for summary judgment on the false arrest claim.[9] Greene argues that Bryan did not have probable cause to arrest him for any crime. Bryan claims that he had probable cause to arrest Greene for disorderly conduct, trespassing, and loitering for the purpose of gambling. In the alternative, Bryan argues that he is entitled to qualified immunity because he had "arguable probable cause." For the reasons discussed below, I find that neither party is able to

---

[8] As defendant does not raise the issue of qualified immunity as to the excessive force claim in his motion papers, I will not address it. I note, however, that it is clearly established that an officer may not use excessive force. Further, had defendant raised the issue of qualified immunity, I would be inclined to find that—construing the facts in the light most favorable to the plaintiff—a reasonable officer would have known that it is unreasonable to push an individual standing at the top of a flight of stairs, with his hands raised in the air. *See Adedeji,* 935 F. Supp. 2d at 569–70.

[9] Bryan also argues that he "cannot be held liable for plaintiff's excessive pre-arraignment detention." Def.'s Mem. of Law 20–23. I will not address this issue, however, since plaintiff did not bring an excessive pre-arraignment detention claim independent of his false imprisonment claim. In the operative complaint, Greene claimed that he was subject to "excessive detention" because he was shackled to a hospital bed for about eight days before being issued a desk appearance ticket, Second Am. Compl. ¶¶ 59–62, 65, ECF No. 68, but he made this claim under the rubric of "False Arrest/False Imprisonment." Similarly, in his motion for summary judgment, Greene argued that "the defendant did not have probable cause to chain the plaintiff to a hospital bed for five days" as part of his argument about the false arrest claim. *See* Pl.'s Mem. of Law in Supp. of his Mot. for Summ. J. 12–13, ECF No. 57-4 ("Pl.'s Mem. of Law"). But Greene did not argue that excessive pre-arraignment detention constituted an independent ground for relief until his response to defendant's summary judgment motion. *See* Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J & in Further Supp. of Pl.'s Mot. for Partial Summ. J. 11–17, ECF No. 65 ("Pl.'s Resp. Br."). Because "it is 'inappropriate to raise new claims for the first time in submissions in opposition to summary judgment,' [plaintiff] waived any claim for excessive, pre-arraignment detention." *Wilson v. City of New York*, 480 F. App'x 592, 594 (2d Cir. 2012) (summary order). Nonetheless, if this case proceeds to trial, Greene may argue that the duration of his detention goes to the issue of damages.

"show[] that there is no genuine dispute as to any material fact and [that he] is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a). I therefore deny the cross-motions for summary judgment on the false arrest claim.

### A. Legal Standard

Under New York law and § 1983, the elements of a false arrest or false imprisonment claim are that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (false arrest); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (false imprisonment). Under both state law and § 1983, an arrest is "privileged" if it "was based on probable cause," but "the defendant[] bear[s] the burden of proving that probable cause existed for the plaintiff's arrest." *Savino*, 331 F.3d at 76 (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994), and *Broughton v. State*, 335 N.E.2d 310, 315 (N.Y. 1975)).

An officer has probable cause to arrest if he or she has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). The inquiry into whether an officer has probable cause is "based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). The question is only "whether probable cause existed to arrest a defendant" for any crime, not necessarily the crime(s) identified at the time by the arresting officer. *Id.* at 154. "[I]t is not relevant whether probable cause existed with

respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Id.*

Under federal law, an "officer is entitled to qualified immunity where '(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act.'" *Jenkins v. City of New York*, 478 F.3d 78, 87 (2d Cir. 2007) (quoting *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001)). "An officer's [probable cause] determination is objectively reasonable if there was 'arguable' probable cause at the time of arrest." *Id.* Moreover, "[a]n officer is entitled to qualified immunity . . . if he had arguable probable cause to arrest the plaintiff for *any* offense." *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017) (emphasis added). An officer has arguable probable cause "when 'it was objectively reasonable for the officer to believe that probable cause existed, or . . . officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (alteration in original) (quoting *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016)).

The only element of plaintiff's false arrest claim that is actually in dispute in this case is whether Bryan had probable cause—or arguable probable cause—to arrest Greene at the time of the arrest. *See* Def.'s Mem. of Law 15–19; Pl.'s Mem. of Law 6–15. It is undisputed that Bryan arrested Greene when he handcuffed Greene to the stretcher, before Greene was placed in the ambulance. *See* Pl.'s 56.1 Statement ¶ 41; Def.'s 56.1 Resp. ¶ 41. The relevant question, therefore, is whether Bryan had (arguable) probable cause to arrest Greene at that point in time. I will deal with each of the three legal justifications that defendant gives for arresting plaintiff in turn.

## B. Obstructing Vehicular or Pedestrian Traffic

Bryan argues that he had probable cause to arrest Greene for disorderly conduct, under the subsection pertaining to obstructing vehicular or pedestrian traffic. Def.'s Mem. of Law in Opp. to Pl.'s Mot. for Summ. J. 27–28, ECF No. 62 ("Def.'s Resp. Br."). "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . , [h]e obstructs vehicular or pedestrian traffic." N.Y. Penal Law § 240.20(5). Disorderly conduct is only a violation, which means it is not a crime under New York law. *See* N.Y. Penal Law § 10.00(6) ("'Crime' means a misdemeanor or a felony.").

Even construing the facts in the light most favorable to the defendant, however, Bryan did not have arguable probable cause to arrest Greene for obstructing pedestrian traffic. The New York Court of Appeals has made clear that, for someone to be guilty of disorderly conduct, there is a requirement of "public harm." *People v. Baker*, 20 N.Y.3d 354, 360 (2013). "This requirement stems from the mens rea component [of the disorderly conduct statute], which requires proof of an intent to threaten public safety, peace or order (or the reckless creation of such a risk)." *Id.* at 359. In other words, "critical to a charge of disorderly conduct is a finding that defendant's disruptive statements and behavior were of a public rather than an individual dimension." *Id.* For this reason, an individual cannot be guilty of disrupting pedestrian traffic unless someone's passage is "actually obstructed"; simply standing in a group on a street corner, for example, does not "satisfy the public harm element of the statute." *People v. Johnson*, 9 N.E.3d 902, 903 (N.Y. 2014).

Here, Bryan could not have reasonably believed that Greene was obstructing pedestrian traffic because there was no one in the hallway other than the men whom Bryan alleges were standing in a group, playing dice. *See* Pl.'s 56.1 Statement ¶ 27; Def.'s 56.1 Resp. ¶ 27. Bryan therefore did not observe Greene "actually obstruct[]" anyone's passage. Further, no officer of

reasonable competence would think that he had probable cause to arrest Greene for obstructing pedestrian traffic when there was no evidence that Greene actually obstructed anyone's passage—and there was no one in the vicinity whose passage could have been obstructed. Thus, as a matter of law, the defendant had neither probable cause nor arguable probable cause to arrest Greene for disorderly conduct. Bryan will not be allowed to offer this justification for the arrest at trial.

### C. Trespass

Bryan also argues that he had probable cause to arrest Greene for trespassing. Def.'s Mem. of Law 16–17; Def.'s Resp. Br. 25–27. There are three relevant offenses: criminal trespass in the second degree (an "A" misdemeanor), N.Y. Penal Law § 140.15; criminal trespass in the third degree (a "B" misdemeanor), N.Y. Penal Law § 140.10; and trespass (a violation), N.Y. Penal Law § 140.05. Each of these offenses requires a defendant to "knowingly enter[] or remain[] unlawfully" in a given location. "A person 'enters or remain unlawfully' in or upon premises when he is not licensed or privileged to do so." N.Y. Penal Law § 140.00(5). Because the offense must be done "knowingly," a person "who honestly believes that he is licensed or privileged to enter is not guilty of any degree of criminal trespass," even if he is not actually so licensed or privileged. *People v. Basch*, 325 N.E.2d 156, 159 (N.Y. 1975).

The basic offense of trespass only requires that someone enter or remain unlawfully "in or upon premises." N.Y. Penal Law § 140.05. Criminal trespass in the third degree requires that someone enter or remain unlawfully "in a building . . . which is fenced or otherwise enclosed in a manner designed to exclude intruders." N.Y. Penal Law § 140.10(a). And criminal trespass in the second degree requires that someone enter or remain unlawfully "in a dwelling." N.Y. Penal Law § 140.15(1). A dwelling is defined as "a building which is usually occupied by a person lodging therein at night." N.Y. Penal Law § 140.00(3). The common areas of apartment buildings, such as

hallways or stairwells, are considered "dwellings" for the purpose of criminal trespass in the second degree. *See People v. Barnes*, 41 N.E.3d 336, 338–39 (N.Y. 2015).

1. *Taking the facts in the light most favorable to the plaintiff, Bryan did not have probable cause or arguable probable cause to arrest Greene for trespassing.*

Taking the facts in the light most favorable to Greene, he was merely standing in the fifth-floor stairwell of Rochdale Village Building Nine and did not flee. April 25, 2017 Greene Dep. 158–59. Further, the defendant testified at his deposition that, at the time that he placed Greene under arrest, "no one had spoken to Mr. Greene" and no officer knew if Greene was a visitor or a resident of the building. Bryan Dep. 116; *see also* Pl.'s 56.1 Statement ¶¶ 43–44. Greene's mere presence in a building is not enough to give Bryan probable cause or arguable probable cause that he was trespassing. Thus, I cannot enter summary judgment for the defendant on this claim. *See People v. Sanders*, 568 N.Y.S.2d 77, 78 (App. Div. 1991) (holding that there was no probable cause to arrest defendant for trespassing because his mere presence in building lobby, combined with his companion's comment that they were "just passing through," did not "provide any basis for an inference that the men were not residents or otherwise lawfully entitled to be in the building").

2. *Taking the facts in the light most favorable to the defendant, Bryan did not have probable cause to arrest Greene for trespassing, but he may have had arguable probable cause.*

Taking the facts in the light most favorable to Bryan, the group of males standing in a circle—including Greene—all ran when he got out of the elevator. Bryan Dep. 55–56. In addition, according to Bryan's testimony at the suppression hearing, Greene told another officer in the stairwell that he did not live in Rochdale Village. Def.'s 56.1 Resp. ¶ 43*;* Suppression Hr'g Tr. 19–20. Although it contradicts his subsequent deposition testimony, I will assume the truth of Bryan's sworn suppression hearing testimony that the plaintiff stated before his arrest that he was not a resident of Rochdale Village. Accordingly, I must evaluate whether Greene's statement that he

was not a resident of Rochdale Village, coupled with his flight from officers, would be enough to give Bryan probable cause to arrest Greene for trespassing.[10]

To prosecute a defendant for trespass, it is the state's burden at trial to show that a criminal defendant does not have a privilege or license to be on the premises. *People v. Brown*, 254 N.E.2d 755, 757 (N.Y. 1969); *In re Lonique M.*, 939 N.Y.S.2d 341, 343 (App. Div. 2012). Indeed, that someone does not have such a privilege or license is an element of the crime of trespass. *See Brown*, 254 N.E.2d at 757 (reversing conviction because the prosecution "failed in their burden of proving each and every element of the crime charged, and specifically, the absence or loss of a statutory privilege or license to enter to remain"); *see also* N.Y. Penal Law § 140.00(5). Because guests and visitors have a "privilege or license" to pass through the common spaces of apartment buildings, *see People v. Graves*, 555 N.E.2d 268, 269 (N.Y. 1990), it cannot be presumed that a person is a trespasser simply because he is not a resident. Thus, even when someone tells the police that he does not live in a building and that he is just "hanging out" in the lobby, this is not enough to convict him of trespassing. *In re James C.*, 805 N.Y.S.2d 13, 14 (App. Div. 2005); *In re Daniel B.*, 768 N.Y.S.2d 230, 231 (App. Div. 2003).

Since these cases deal with the proof required at trial, they do not speak to the specific question here—whether officers must have probable cause to believe that someone is not an invited guest to arrest him for trespassing. I conclude that they do. Under New York law, every degree of trespass requires the defendant to enter or remain unlawfully. And someone "'enters or

---

[10] According to Bryan, Greene later said at the hospital that he knew someone who lived in Rochdale Village although he would not reveal his or her name. Def.'s 56.1 Resp. ¶ 43; Suppression Hr'g Tr. 14. But I cannot consider this statement when determining whether "the facts known by the arresting officer *at the time of the arrest* objectively provided probable cause to arrest," *Jaegly*, 439 F.3d at 153 (emphasis added), because this conversation occurred after the time that Bryan placed Greene under arrest. Bryan admits that he arrested Greene when he handcuffed Greene to the EMS stretcher. Def.'s 56.1 Resp. ¶ 41. Any statements made after that time are not relevant to the probable cause analysis.

remain unlawfully' in or upon premises when he is not licensed *or* privileged to do so." N.Y. Penal Law § 140.00(5) (emphasis added). Thus, an officer needs probable cause to believe that someone is neither a resident nor an invited guest in order to have probable cause to arrest him for trespassing in the common areas of an apartment building.

In other words, "it is the state's burden to prove that an [individual] does not have privilege or license to remain on the premises. Because it is an element of the crime, officers must have probable cause to believe that a person does not have permission to be where she is before they arrest her for trespass." *Mitchell v. City of New York*, 841 F.3d 72, 78 (2d Cir. 2016) (quoting *Davis v. City of New York*, 902 F. Supp. 2d 405, 426 (S.D.N.Y. 2012)). For this reason, New York courts have required officers to have reasonable grounds to believe that someone was neither a resident nor an invited guest in order to have probable cause to believe that he is trespassing. *People v. Ruiz*, No. 056832C-2006, 2007 WL 1428689, at *2 (N.Y. Sup. Ct. 2007) (holding trespass complaint to be facially insufficient where it alleged that the defendant was present in the lobby of a locked building where he did not live, but did not give any "indication that he was anything other than an invitee to the building."); *see also People v. Babarcich*, 561 N.Y.S. 2d 255, 256 (App. Div. 1990) (holding that because "the defendant lied about the reason for his presence and failed to offer any legitimate explanation for it, the officer was justified in concluding that the defendant in fact had no privilege to be on the premises of the apartment complex" and thus had probable cause to arrest him for trespassing); *People v. Easton*, No. 2007NY001211, 2007 WL 1840853, at *1 (N.Y. Crim. Ct. 2007) ("[A]s residents of a multi-unit apartment building and their invited guests plainly have license or privilege to travel through the building's common areas, a charge of trespass based on presence in the building's lobby cannot survive in the absence of evidence that the defendant was neither a resident nor an invitee."). *But see People v. Messina*, 919 N.Y.S.2d 814, 820 (Crim. Ct.

2011) (holding that, standing alone, the defendant's admission "that he did not reside in the building is sufficient" to provide probable cause to believe that he was trespassing).[11]

A recent decision of the New York Court of Appeals supports this conclusion. In *People v. Barnes*, the defendant was seen in the lobby of an apartment building and, "[w]hen asked, . . . stated that he did not reside at the building," and was not "able to identify any resident who had invited him. Having determined that defendant was neither a tenant nor an invited guest, the officer arrested him for trespassing." 26 N.Y. 3d at 987–88. The court rejected a claim that the complaint charging the defendant with criminal trespass "was facially insufficient because it failed to establish that defendant lacked license or privilege to be in the lobby." *Id.* at 990. *Barnes* held that it was sufficient to provide "reasonable cause to believe defendant committed" trespass that he "admitted he did not reside at the building *and* could not identify a resident who had invited him onto the premises." *Id.* (emphasis added). This is significant because the standard for facial sufficiency of a misdemeanor complaint is essentially identical to the probable cause inquiry:

---

[11] *Messina*, however, is both unpersuasive and an outlier. *Messina*'s holding is predicated on its claim that "the People are not required to allege facts negating the possibility that the defendant had been an invited guest of one of the Housing Authority's tenants. Rather, the existence of such an invitation can be raised as a defense at trial and must be proven by the defendant." *Id.* But this statement of the law is inconsistent with the holdings of both the New York Court of Appeals and the Appellate Division, which put the burden of proving that an individual does not have a privilege or license to be on the premises on the government. *See Brown*, 254 N.E.2d at 757; *James C.*, 805 N.Y.S.2d at 14; *Daniel B.*, 768 N.Y.S.2d at 231. Nor do I find compelling *Messina*'s argument that requiring police officers to determine that someone does not have a privilege or license to be present in an apartment building before arrest would require officers to "interview[] all of the tenants in a building." 919 N.Y.S.2d at 820. In the mine run of cases, this determination would simply require a police officer to ask someone what he was doing in the building. In fact, the vast majority of New York cases dealing with trespass arrests have found that police officers have probable cause to believe that a defendant was trespassing because he was unable to provide an explanation for his presence in a building, provided a false answer, or provided an answer that the police could not verify. *See, e.g., People v. Wighfall*, 866 N.Y.S. 2d 625, 625–26 (App. Div. 2008); *In re Troy F.*, 526 N.Y.S.2d 521, 523 (App. Div. 1988); *People v. Graham*, No. 2015BX012102, 2015 WL 4920076, at *3–4 (N.Y. Crim. Ct. Aug. 6, 2015) (collecting cases where complaints have been held to be sufficient).

whether the complaint "allege[s] facts of an evidentiary character demonstrating 'reasonable cause' to believe the defendant committed the crime charged." *People v. Dreyden*, 931 N.E.2d 526, 527 (N.Y. 2010) (citations omitted); *see* N.Y. Crim. Proc. Law §§ 140.10, 140.25 (stating that a police officer or peace officer may arrest a person without a warrant for a "crime when he or she has reasonable cause to believe that such person has committed such crime").

Having established that an officer must have probable cause to believe that someone is not an invited guest to have probable cause to arrest him for trespassing in the common areas of an apartment building, I now turn to the question of what evidence there was that Greene was not an invited guest. Viewing the evidence in the light most favorable to Bryan, the only such evidence is Greene's flight. Greene's statement that he did not live in Rochdale Village establishes only that he was not a resident.

Unprovoked flight from the police "'is certainly suggestive' of wrongdoing and can be treated as 'suspicious behavior' that factors into the totality of the circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 587 (2018) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000)). "In fact, 'deliberately furtive actions and flight at the approach of . . . law officers are *strong* indicia of *mens rea.*'" *Id.* (alteration in original) (quoting *Sibron v. New York,* 392 U.S. 40, 66 (1968)). Thus, "[a] reasonable officer could infer" that flight is an indication that someone "knew they were not supposed to be there." *Id.*

Yet this does not mean that flight alone can support an arrest. Although a suspect's flight can, "under certain circumstances, provide reasonable suspicion to warrant a *Terry* stop, it does not, without more, provide probable cause to arrest." *Jenkins*, 478 F.3d at 89 n.12 (citing *Wardlow*, 528 U.S. at 124–25). "[T]here are innocent reasons for flight from police and . . . flight is not necessarily indicative of ongoing criminal activity." *Wardlow*, 528 U.S. at 125. Moreover, even if

Greene's flight was indicative of guilt, he could have been fleeing because he was gambling rather than because he was trespassing. But, drawing all inferences in favor of Bryan, I will construe Greene's flight as evidence that he was trespassing.

This is still not enough to provide Bryan probable cause to arrest Greene for trespass. Other than Greene's flight, there was no reason for Bryan to believe that Greene was not an invited guest. Furthermore, the fact that Greene was apprehended with Skinner—who Bryan knew was a resident of Rochdale Village—would tend to suggest instead that he was an invited guest. (While defendant argues that residents of Rochdale Village are only allowed in the building where they live—and Skinner did not live in Building Nine—there is no reason to assume that non-residents would know that. Greene's association with Skinner would at least tend to negate that Greene was knowingly present without license or privilege.) Even viewing the facts in the light most favorable to Bryan and drawing all inferences in his favor, Greene's flight would at most have provided reasonable suspicion that he did not have a license or privilege to be present. Thus, as a matter of law, Bryan did not have probable cause to arrest the plaintiff for trespassing.

Nevertheless, Bryan may be able to raise a qualified immunity defense at trial. There are multiple disputes of fact—such as whether Greene fled and whether Greene said he did not live at Rochdale Village—that bear on the issues of whether Bryan had arguable probable cause to arrest Greene for trespassing. and whether Bryan violated clearly established law. I note that the standard for arguable probable cause is quite forgiving: although arguable probable cause does not "mean 'almost' probable cause," *Jenkins*, 478 F.3d at 87, an officer is entitled to qualified immunity if "officers of reasonable competence could disagree on whether the probable cause test was met," *Kass*, 864 F.3d at 206. I also note that there is no controlling New York case law governing the question of whether Bryan had probable cause to arrest Greene for trespassing on Bryan's version

of the facts. Indeed, at least one state court judge would find that Bryan had probable cause to arrest Greene for trespassing simply because Greene was not a resident of the building. *See Messina*, 919 N.Y.S.2d at 820. Therefore, if this case goes to trial, I will permit Bryan to litigate the factual and legal issues relevant to qualified immunity as well as submit factual questions relevant to establishing the defense for the jury's determination.

### D. Loitering for the Purpose of Gambling

Finally, Bryan argues that, as a matter of law, he had probable cause to arrest Greene for loitering for the purpose of gambling. Def.'s Mem. of Law 17–18; Def.'s Resp. Br. 25–27. It is a violation to "loiter[] or remain[] in a public place for the purpose of gambling with cards, dice or other gambling paraphernalia." N.Y. Penal Law § 240.35(2).[12] The definition of "public place" includes "hallways, lobbies and other portions of apartment houses." N.Y. Penal Law § 240.00(1).

Issues of disputed fact preclude me from determining whether Bryan had either probable cause or arguable probable cause to arrest Greene for loitering for the purpose of gambling.

It is undisputed that Bryan received a call from the Rochdale Village dispatcher around the time of this incident that individuals were gambling in the fifth floor hallway of Building Nine. Pl.'s 56.1 Statement ¶¶ 28–29; Def.'s 56.1 Statement ¶ 7. Greene, however, disputes that anyone was in fact gambling. He testified that he was standing in the fifth floor stairwell with his friends Jonathan Skinner and Edward Horry, conversing with some men who had been standing in the hallway, and that he did not see anyone gambling. April 25, 2017 Greene Dep. 140, 146. On the other hand, Bryan testified at his deposition that, when the elevator doors opened on the fifth floor of Building Nine, he saw five or six men standing in a circle one or two feet in front of the

---

[12] While Greene notes that the constitutionality of this statute "has been called into question," Pl.'s Resp. Br. 10 n.5, he does not argue that it is unconstitutional. I will therefore not address this issue.

elevator. Bryan Dep. 64. Greene was part of this circle of men. *Id.* at 73. One of these men was shaking his hand as if to throw dice, and other individuals had money in their hands. *Id.* at 75–76. As discussed above, there is also a dispute as to whether Greene fled from Rochdale security.

Construing the evidence in the light most favorable to the plaintiff, Bryan had neither probable cause nor arguable probable cause to arrest Greene for loitering for the purpose of gambling. Although he admits that Bryan received a call pertaining to gambling, Greene testified that he did not see anyone playing dice. And since Greene denies fleeing from Rochdale Village security, this cannot be used to elevate Bryan's level of suspicion either. No officer of reasonable competence would think that a call stating that men were gambling on the fifth floor, standing alone, provided probable cause to believe that Greene was loitering for the purpose of gambling.[13]

On the other hand, construing the evidence in the light most favorable to the defendant, Bryan had at the very least arguable probable cause to arrest Greene for loitering for the purpose of gambling. Although Bryan admits that he did not see Greene holding dice or money, Def.'s 56.1 Resp. ¶ 34, he testified that Greene was part of a circle of five or six men who were playing dice, Bryan Dep. 65, 66, 73. Then, according to Bryan, Greene fled, thereby elevating Bryan's level of suspicion. *See Wardlow*, 528 U.S. at 124 ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). On these facts, it would be objectively reasonable for Bryan to believe that he had probable cause to arrest Greene. *See People v. Buckhannon*, No. 2015BX013607, 2015 WL

---

[13] Even crediting the testimony of Greene's friend, Jonathan Skinner, instead of Greene's testimony, there still would not be probable cause or arguable probable case to believe that Greene was loitering for the purpose of gambling. Skinner testified that the men who were in the hallway when he and his friends got off the elevator were in fact playing dice, but that he and his friends stood apart in the stairwell talking with some of these men and did not join in the game. Skinner Dep. 71–80. It is black-letter law that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

5431888, at *9 (N.Y. Crim. Ct. Sept. 8, 2015) (holding that misdemeanor complaint alleging that an "officer observed the defendant and others in a circle, throwing dice and currency into a circle in front of them," was facially sufficient to allege loitering for the purpose of gambling); *see also In re Victor M.*, 876 N.E.2d 1187, 1188–89 (N.Y. 2007). *But see People v. Greenhill*, No. 2017NY047521, 2017 WL 6601862, at *3 (N.Y. Crim. Ct. Dec. 26, 2017) (holding that misdemeanor complaint was not facially sufficient because it alleged only that "the defendant was with *other* individuals who were exchanging money and rolling dice on the ground").

Plaintiff nonetheless argues that, as a matter of law, Bryan did not have probable cause to arrest him because Bryan did not observe him holding dice or money and "probable cause does not exist if the arresting officer does not observe a suspect holding money, exchanging money with others, or even rolling dice." Pl.'s Resp. Br. 10. But the case plaintiff cites for this proposition, *People v. Rollins*, 4 N.Y.S.3d 443 (N.Y. App. Div. 2015), does not support his argument. *Rollins* held that there was insufficient evidence to support probable cause for a different offense—possession of a gambling device. *Id.* at 445. It did not reach the issue of whether there was probable cause that the defendant was loitering for the purpose of gambling because the prosecution had not raised this argument before the suppression court. *Id. Rollins*, therefore, offers plaintiff no help.

Greene also argues that Bryan could not have had probable cause to arrest him for loitering because this offense is a violation, not a crime. Pl.'s Resp. Br. 9–11. He claims that Bryan "did not actually observe [him] commit this violation" and notes that, as a peace officer, Bryan "is only authorized to arrest individuals for violations if they are *committed in his presence*." *Id.* at 10 (citing N.Y. Crim. Proc. Law § 140.25(1)). But this argument conflates the analytically distinct issues of whether Bryan had probable cause to arrest Greene and whether Bryan had the statutory authority to arrest him. It is irrelevant to the Fourth Amendment inquiry whether Bryan had the statutory

authority, under New York law, to arrest Greene for a violation; the only pertinent question is whether Bryan had (arguable) probable cause. *See Virginia v. Moore*, 553 U.S. 164, 167, 177–78 (2008) (holding that the Fourth Amendment "does not require the exclusion of evidence obtained from a constitutionally permissible arrest" for driving with a suspended license even though, under state law, officers were required to issue the defendant a summons instead of arresting him).

I conclude that whether Bryan had (arguable) probable cause to arrest Greene for loitering for the purpose of gambling depends on the resolution of a number of issues of disputed fact. I therefore deny summary judgment to both parties on the false arrest claim.

### III. Issues of disputed fact preclude granting summary judgment for either party on the malicious prosecution claim.

For similar reasons as with the false arrest claim, I cannot enter summary judgment in favor of either party with regard to plaintiff's malicious prosecution claim.

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (internal citations omitted). Under New York law, malicious prosecution has four elements: "a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Id.* at 161 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir 1997)); *accord Broughton*, 335 N.E.3d at 314. In addition, a plaintiff must show "a post-arraignment seizure." *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013). This is because malicious prosecution claims stem from "the Fourth Amendment's prohibition of unreasonable seizures." *Id.*

Defendant disputes each of these elements. Def.'s Supp. Mem. of Law in Opp to Pl.'s Mot. for Summ. J. on the Issue of Malicious Prosecution, ECF No. 73 ("Def.'s Supp. Mem. of Law"). But only the elements of probable cause and malice are truly at issue. Notwithstanding defendant's attempts to distinguish controlling precedent, *see id.* at 6–12, 16–18, the other elements of a malicious prosecution claim are at the very least sufficient for the claim to reach a jury.

First, a reasonable jury could find that Bryan initiated the criminal proceedings by signing the criminal court complaint. A law enforcement officer's signing of a criminal court complaint is sufficient for the jury to find that the officer initiated a prosecution for purposes of a malicious prosecution claim. *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("Under New York law, police officers can 'initiate' prosecution by filing charges or other accusatory instruments."); *Bounds v. City of New York*, 12-CV-1772, 2014 WL 2440542, at *6 (E.D.N.Y. May 30, 2014) (same); *Sankar v. City of New York*, 867 F. Supp. 2d 297, 311 (E.D.N.Y. 2012) (same).

Second, as a matter of law, the criminal proceedings were terminated in the plaintiff's favor when they were dismissed on speedy trial grounds. *Rogers v. City of Amsterdam*, 303 F.3d 155, 160 (2d Cir. 2002) ("[U]nder New York law, a dismissal pursuant to New York Criminal Procedure Law § 30.30—New York's speedy trial statute—constitutes a favorable termination."); *Smith-Hunter v. Harvey*, 734 N.E.2d 750, 753 (N.Y. 2000) (same).

Third, there was a post-arraignment seizure within the meaning of the Fourth Amendment. The Second Circuit has "consistently held that a post-arraignment defendant who is 'obligated to appear in court in connection with [criminal] charges whenever his attendance [i]s required' suffers a Fourth Amendment deprivation of liberty." *Swartz*, 704 F.3d at 112 (alterations in original) (quoting *Murphy*, 118 F.3d at 947). Here, Greene was obligated to appear in court in connection with the criminal case. Although he was initially excused from appearing in criminal

court while he was recuperating from his fractured leg, Pl.'s 56.1 Statement ¶ 61, Greene did eventually appear in court multiple times in connection with this case. *See* Suppression Hr'g Tr. 30; Washington Decl., Ex. 23, at 3, ECF No. 60-3 (Tr. of May 5, 2014 Court Appearance).

This leaves to be addressed only the elements of probable cause and actual malice, which are typically treated together since "[a] lack of probable cause generally creates an inference of malice." *Manganiello*, 612 F.3d at 163 (alteration in original) (quoting *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003)). Indeed, if there is "an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact." *Boyd*, 336 F.3d at 78. But this does not mean that the jury must find actual malice simply because there is no probable cause: "a jury may, but is not required to, infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding." *Martin v. City of Albany*, 364 N.E.2d 1304, 1307 (N.Y. 1977); *accord Cox v. County of Suffolk*, 827 F. Supp. 935, 940 (E.D.N.Y. 1993) ("The existence of malice is a question of fact for the jury to decide.").

The probable cause inquiry is somewhat different for malicious prosecution claims than for false arrest claims. With a malicious prosecution claim, the relevant question is not whether there was probable cause to arrest someone for any offense, but instead "whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced." *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 390 (E.D.N.Y. 2013) (quoting *Davis v. City of New York*, 373 F. Supp. 2d 322, 333 (S.D.N.Y. 2005)); *see also, e.g.*, *Manganiello*, 612 F.3d at 161 (stating that the issue is whether there was "probable cause for commencing the proceeding"). Thus, even if there was probable cause to prosecute Greene for a lesser offense—such as loitering for the purpose of gambling—the plaintiff can still bring a malicious prosecution action if there was not probable cause to prosecute him for the crime charged by the misdemeanor complaint—

trespass. *See Davis*, 373 F. Supp. 2d at 334. In addition, "[p]robable cause is measured at a different point in time in a malicious prosecution action than a false arrest action . . . . [T]he existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced." *Id. at* 333 (quoting *Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000)).

Although the question of probable cause is to be examined based on the information Bryan had when he signed the criminal complaint, not at the time of the arrest, issues of disputed fact still preclude summary judgment. Several things that happened after the plaintiff's arrest are relevant to this determination. First, according to Greene, when Bryan asked him in the ambulance what he was doing in the hallway, he did not respond. July 6, 2017 Greene Dep. 38. Second, Bryan filled out an arrest report which listed an address other than Rochdale Village for the defendant— an address where Greene testified he had previously lived. *See* Arrest Report; April 25, 2017 Greene Dep. 22–23. The record is silent, however, on how Bryan obtained this information. And, third, Bryan testified at the suppression hearing that, when they were at Jamaica Hospital, he asked Greene whether Greene knew anyone at Rochdale and Greene responded that "he did, but he didn't want to give us nobody's name." Suppression Hr'g Tr. 14.

As discussed above, to have probable cause to arrest someone for trespassing, the state must have probable cause to believe that this person was neither a resident nor an invited guest. But, here, construing the evidence in the light most favorable to the plaintiff, Bryan did not have probable cause to believe either of these things.[14]

---

[14] I will not discuss the issue of arguable probable cause here because Bryan did not raise a qualified immunity defense in his briefing on the issue of malicious prosecution. *See McCardle v. Haddad*, 131 F.3d 43, 50–52 (2d Cir. 1997) (finding that defense of qualified immunity was waived).

Drawing all inferences in favor of the plaintiff, Bryan did not have probable cause to believe that Greene was not a resident of Rochdale Village. Although Bryan wrote down on the arrest report that Greene lived at a different address, the record is silent as to where he obtained this information. If Bryan obtained this information from Greene's identification, this address may have been out of date; Greene may have moved to Rochdale Village, but failed to update his identification. Thus, drawing all inferences in favor of Greene and resolving all ambiguities in his favor, I cannot conclude that Bryan had probable cause to believe that Greene was not a resident.

Similarly, drawing all inferences in favor of the plaintiff, I cannot conclude that Greene's failure to respond to Bryan's question about what he was doing in the hallway provided Bryan probable cause to believe that he was not an invited guest. Greene testified that during his conversation with Bryan in the ambulance, he kept repeating that Bryan had broken his leg. July 6, 2017 Greene Dep. at 38. Thus, a reasonable jury might conclude that Greene's failure to respond to Bryan's question about what he was doing in the hallway was not evasive or suggestive of guilt, but instead simply reflected his focus on his broken leg. This is not enough to provide probable cause to prosecute the plaintiff.

Further, if there was no probable cause to prosecute the plaintiff, a reasonable jury could also find for Greene on the issue of malice. *See Manganiello*, 612 F.3d at 163; *Boyd*, 336 F.3d at 78.[15]

On the other hand, taking the facts in the light most favorable to the defendant, Bryan had probable cause to initiate a prosecution of Greene for trespassing. Bryan testified at the

---

[15] In addition to reiterating his arguments about probable cause from the false arrest context, Def.'s Supp. Mem. of Law 12–15, defendant relies on a non-precedential Second Circuit decision, *Laboy v. County of Ontario*, as to the element of malice. Def.'s Supp. Mem. of Law 15–16. *Laboy*, however, is not on point. In *Laboy*, the plaintiff had been indicted by a grand jury, which "creates a presumption of probable cause." 668 F. App'x 391, 394 (2d Cir. 2016). But, here, Greene was never indicted; his prosecution was instead commenced by the criminal court complaint sworn to by Bryan. Such a misdemeanor complaint does not create a presumption of probable cause that must be rebutted.

suppression hearing that Greene stated after his arrest that he knew someone at Rochdale Village, but he refused to provide Bryan with this person's name. Suppression Hr'g Tr. 14. This is the kind of affirmative response indicative of an "inability to explain one's presence in a building" that, coupled with the fact that the defendant lived elsewhere, New York courts have regularly found "sufficient, for pleading purposes, to establish trespass." *People v. Graham*, 2015 WL 4920076, at *4. And Bryan's level of suspicion could have only been elevated by Greene's flight. *See Wesby*, 138 S. Ct. at 587; *Wardlow*, 528 U.S. at 124–25. Therefore, construing the evidence in the light most favorable to the defendant, there was probable cause to commence a prosecution. *See In re Bobby J.*, 670 N.Y.S.2d 598, 599 (App. Div. 2008) (holding that juvenile's initial attempts to evade the police, plus his "vague and evasive responses to questions regarding his presence in the building and fail[ure] to provide the officer with a valid reason for being there despite receiving ample opportunity to do so," gave rise to probable cause that he was trespassing); *People v. Magwood*, 688 N.Y.S.2d 526, 527 (App. Div. 1999) (holding that when "defendant said she was visiting a friend but then either could not or would not identify the friend," this provided probable cause to arrest her for trespass); *People v. Smith*, 527 N.Y.S.2d 804, 805–06 (App. Div. 1988) (holding that defendant's "flight, coupled with his subsequent inability to state any license or privilege to be in the building, certainly gave rise to probable cause to arrest").

In sum, since there are disputed issues of material fact as to probable cause and thus as to malice, I deny summary judgment to both parties on the malicious prosecution claim.

# CONCLUSION

For the foregoing reasons, the plaintiff's motion for partial summary judgment and the defendant's motion for complete summary judgement are denied. Nonetheless, I rule that the defendant will be precluded from arguing at trial that he had either probable cause or arguable probable cause to arrest the plaintiff for disorderly conduct. Bryan will also be precluded from arguing at trial that he had probable cause to arrest Greene for trespass, although he will be permitted to raise the issue of qualified immunity as to this claim. The parties must now proceed to either settlement or trial. A joint pretrial order is due thirty days from the entry of this order; however, the parties may request an extension to engage in good-faith settlement negotiations.

Dated: July 23, 2018  
       Brooklyn

_____/s/_____  
Allyne R. Ross  
United States District Judge